UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LESLIE ORR

               Plaintiff,              CIVIL ACTION NO. 05-CV-72986-DT

     vs.                  DISTRICT JUDGE MARIANNE O. BATTANI

COMMISSIONER OF            MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

               Defendant.
_____/

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

      This Court recommends that Defendant's Motion for Summary Judgment (Docket # 13) should be **DENIED**. Plaintiff's Motion for Summary Judgment (Docket # 12) should be **DENIED**. The case should be **REMANDED** to the Commissioner for further proceedings consistent with this Report.

II.     PROCEDURAL HISTORY

      This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382.

      Plaintiff Leslie Orr filed an application for Disability Insurance Benefits (DIB) in September 1998 and Social Security Income Benefits ("SSI") in January 1999. (Tr. 65, 76, 475).

She alleged she had been disabled since November 1997 due to bursitis, systemic mastocytosis with joint and bowel involvement, and arthritis. *Id.* Plaintiff's claims were denied initially and upon reconsideration. (Tr.51-58, 478-81). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 59). A hearing took place before ALJ Brown on March 10, 2000. (Tr. 552-604). ALJ Brown denied Plaintiff's claims on April 21, 2000. (Tr. 482-87). Plaintiff sought review. (Tr. 498, 500-01). The Appeals Council granted Plaintiff's request for review of the ALJ's decision and the case was remanded for reconsideration in January 2002. (Tr. 502-05). A second hearing took place before ALJ Musseman on July 24, 2002. (Tr. 605-36). ALJ Musseman denied Plaintiff's claim in an opinion issued on March 25, 2003. (Tr. 28-40). The Appeals Council denied Plaintiff's request for review on July 8, 2005 and its decision is now the final decision of the Commissioner. (Tr. 9-27). Plaintiff appealed the denial of her claims to this Court, and both parties have filed motions for summary judgment.

III.   **MEDICAL HISTORY**

    A.   **Plaintiff's Physical Health Treatment**

Plaintiff's medical records indicate that she has a history of various surgeries, including a total abdominal hysterectomy, pelvic laparotomy and appendectomy, and arthroscopic surgery of the left shoulder. (Tr. 10, 126, 191).

In early 1997, Plaintiff was treated for migraine headaches which were accompanied by nausea at the Lapeer County Emergency Room. No focal or neurological deficits were noted. Plaintiff was treated with medication and released. (Tr. 145-58). Plaintiff was also treated in

1997 by her treating physician, Dr. Charles Franckowiak, for various complaints, including continuing left shoulder pain, back muscle spasms and pain, and chest pain and congestion. Dr. Franckowiak prescribed various medications to treat Plaintiff's ailments. (Tr. 163-67). Plaintiff was also seen by a gynecologist for complaints of urinary leakage, dull backaches, and hot flashes. Plaintiff stated that she was restless and would frequently wake up in the middle of the night. She also reported that she often broke out in hives. (Tr. 159). The gynecologist diagnosed Plaintiff with incontinence with nocturia, post-menopausal syndrome, and fibrocystic breasts. Plaintiff was treated with medication. (Tr. 160-61).

In June 1998 Plaintiff was seen by an orthopedic surgeon, Dr. John DeSantis, for left knee pain and swelling. Plaintiff told Dr. DeSantis that she had been doing a lot of gardening and digging. Plaintiff's knee was treated with a trial of injections and anti-inflammatory medication. Plaintiff returned to Dr. DeSantis in August 1998 for continuing knee pain. She told Dr. DeSantis that the injections had helped but that it was only a "band-aid" measure. Therefore, Plaintiff stated that she wanted to have arthroscopic surgery on her knee. (Tr. 213). The surgery was performed on August 27, 1998. (Tr. 214). By September 1998, Dr. DeSantis noted that Plaintiff was doing well and had an excellent range of motion with no effusion in her knee. (Tr. 212).

Plaintiff was also seen in 1998 by another treating physician, Dr. Wayne Dittrich, who was a general practitioner. Plaintiff reported various symptoms, including hives and diarrhea.

-3-

(Tr. 233). Dr. Dittrich diagnosed Plaintiff, in part, with systemic mastocytosis[1], gastroesophageal reflux disease, and migraines. *Id.* Dr. Dittrich prescribed several medications to treat these conditions. *Id.*

A consultative examination was performed in November 1998. The examiner found that Plaintiff had mild swelling in her left knee and a mild limitation in Plaintiff's range of motion in her spine and knees. (Tr. 216-18).

The record also documents Plaintiff's ongoing treatment with Dr. Franckowiak and Dr. Dittrich. Plaintiff was treated on a monthly basis by Dr. Franckowiak from late 1998 through May 2002. (Tr. 455-74). Plaintiff reported various symptoms to Dr. Franckowiak, including neck, back, throat, elbow, abdominal, and head pain, coughing, fatigue, left hand numbness, painful skin lesions and lipomas, and difficulty sleeping. *Id.* Dr. Franckowiak diagnosed systemic mastocytosis and prescribed several pain medications, anti-allergy medication, anti-inflammatory medication, and medication to treat Plaintiff's gastric pain, menopausal symptoms, and bladder control issues. *Id.*

Plaintiff also continued her treatment with Dr. Dittrich in 1999 and early 2000. Dr. Dittrich treated Plaintiff for scalp and neck lumps, rashes, hives, and bone and joint pain. (Tr. 252-54, 320-23). Dr. Dittrich confirmed his diagnosis of mastocytosis. He also diagnosed neurodermatitis and chronic urticaria. (Tr. 252-54). Dr. Dittrich prescribed various medications

---

[1]     Mastocytosis is a group of rare diseases which are characterized by infilitrates of mast cells in the tissues and sometimes other organs. *Dorland's Illustrated Medical Dictionary* 1104.

to treat each of Plaintiff's symptoms and referred her to a dermatologist and a hematologist. (Tr. 252-54, 320-23).

In August 1999 Dr. Dittrich completed a form entitled "Treating Physician Medical Questionnaire – Physical." (Tr. 269-73). Dr. Dittrich opined that due to her impairments, Plaintiff: (1) could not stand for more than 30-40 minutes at a time; (2) could not sit for more than 30-45 minutes at a time; (3) could not walk for more than one to two blocks without stopping; (4) could lift and carry less than 5 pounds; and (5) could not pull, push, squat, kneel, reach, twist, turn, or grasp. He also opined that Plaintiff needed to lie down for one hour per day in the afternoon and to avoid extremes in temperature. *Id.*

Plaintiff was referred to Dr. Friedman, a dermatologist, for the itchy sores on her scalp. An examination of Plaintiff's body revealed scattered ulcers with urticarial wheals. Dr. Friedman diagnosed Plaintiff with urticaria pigmentosa and mastocytosis. (Tr. 241-50). Subsequent blood work also showed that Plaintiff had abnormally high levels of tryptase, which was suggestive of mastocytosis. (Tr. 513). A biopsy was performed on Plaintiff's skin lesions, which revealed toxic dermatitis consistent with urticaria. (Tr. 248-49). Plaintiff was treated with medication, a Medrol Dosepack, and cortisone injections. (Tr. 241-50, 262).

In 2001 Plaintiff was treated for painful lumps on her back. She was given medication and subsequently referred to a surgeon. (Tr. 322-24). In July 2001 Plaintiff had outpatient surgery to remove two lipomas on her back. (Tr. 329-31, 339, 417, 427). Other lipomas were

later identified and Plaintiff had surgery to remove them in February and March 2002. (Tr. 395-98, 437).

### B.   Plaintiff's Mental Health Treatment

Plaintiff underwent counseling at the Lapeer County Community Mental Health Center from July 1991 until January 1992 for anger, anxiety, and depression.[2] She was diagnosed with neurotic depression and was prescribed Xanax.  Upon Plaintiff's discharge, her Global Assessment of Functioning "(GAF") score was a 61[3] and she was no longer on medication. However, the psychiatrist's notes indicate that Plaintiff made no more than minimal progress toward her therapeutic goals.  (Tr. 294-316).

Plaintiff returned to the Lapeer County Community Mental Health Center in January 1999 for counseling to treat depression, anxiety, difficulty coping, and panic attacks.  (Tr. 282). The intake therapist, a social worker, noted that Plaintiff was occasionally restless and fidgety during the interview.  She demonstrated slight fear, anxiety, apprehension, depression, and sadness.  (Tr. 283).  The therapist also noted that Plaintiff had difficulty acknowledging the presence of psychological problems and mostly blamed others or circumstances for her problems.  (Tr. 284).  The therapist diagnosed Plaintiff with dysthmic disorder and panic

---

[2]     The record indicates that prior to Plaintiff's treatment at the Mental Health Center, Plaintiff was also being prescribed Xanax for anxiety and depression.  (Tr. 190).

[3]     A GAF of between 61 to 70 indicates only "some mild symptoms."  *American Psychiatric Association Diagnostic and Statistical manual of Mental Disorders* ("DSM-IV-TR") 34 (4th ed. 2000).

disorder without agoraphobia. The treatment plan, which was approved by a psychiatrist, was to reduce Plaintiff's panic and anxiety levels and to increase her affect by April 1999. (Tr. 290-92). Thereafter, Plaintiff was seen by a therapist on two occasions. The focus of these two sessions was on Plaintiff's relationships with her mother, husband, and daughter. (Tr. 288-89).

In April 1999, the record indicates that Plaintiff refused to provide a state agency psychologist with her activities of daily living or to participate in a consultative examination. Consequently, the psychologist was unable to complete a Psychiatric Review Technique form. (Tr. 99-107).

In his August 1999 responses to the Treating Physician Medical Questionnaire, Dr. Dittrich opined that Plaintiff's pain would likely interfere with her ability to maintain sustained concentration and attention in a work-like setting due to Plaintiff's marked limitations in this area. (Tr. 270).

Plaintiff was seen by Dr. James Grosenbach, a clinical psychologist, in February 2002. (Tr. 399-402). Plaintiff reported anxiety, stress, and difficulties sleeping and concentrating. (Tr. 399). Dr. Grosenbach noted that Plaintiff had a severe memory deficit and a recent memory deficit. Her ability to think abstractly and to make computations was impaired and she had limited concentration. (Tr. 400). However, Plaintiff had adequate judgment and insight. (Tr. 401). Dr. Grosenbach also recorded that Plaintiff was guarded, reactive and compulsive. (Tr. 400). He described Plaintiff's mood as mildly depressed but severely anxious. Dr. Grosenbach

diagnosed Plaintiff with a generalized anxiety disorder and assigned Plaintiff a GAF score of 55.[4] (Tr. 402).

During their initial meeting, Dr. Grosenbach also had Plaintiff fill out a "Patient Rated Anxiety Scale." (Tr. 402-06). Plaintiff rated all of her anxiety-related symptoms as being marked to extreme in severity. *Id.* Dr. Grosenbach then scored Plaintiff's responses to the Scale, which resulted in a finding of severe endogenous anxiety and severe exogenous anxiety or phobia. (Tr. 406).

Plaintiff subsequently had four therapy sessions with Dr. Grosenbach between March 4, 2002 and May 14, 2002. (Tr. 407-08). On May 14, 2002 Dr. Grosenbach completed a form entitled "Treating Physician Medical Questionnaire – Mental" at the request of Plaintiff's counsel. (Tr. 409-12). Dr. Grosenbach described Plaintiff's condition as an anxiety disorder with panic attacks and agoraphobia with an onset date of 1992. However, he diagnosed Plaintiff with generalized anxiety disorder and panic disorder without agoraphobia. (Tr. 409).

Based upon his clinical interviews and the Patient Rated Anxiety Scale, Dr. Grosenbach stated that Plaintiff had an affective disorder, which resulted in marked restrictions of activities of daily living and marked difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 409-10). He further opined that Plaintiff had a medically documented history of a chronic affective disorder of at least a two year duration,

---

[4]     A GAF score of 55 is indicative of "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." DSM-IV-TR 34.

-8-

which caused more than minimal limitations in the ability to do basic work activities and for which even a minimal increase in mental demands or change in the environment would cause Plaintiff to decompensate. (Tr. 410). Dr. Grosenbach also opined that Plaintiff had an anxiety-related disorder, which resulted in marked difficulties with maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 410).

Dr. Grosenbach noted that as a result of her mental and physical impairments, Plaintiff was required to lie down for at least 2 hours daily and would be absent from work on an average of 4 times or more per month due to her mental impairment or treatment of the impairments. (Tr. 411, 412).

Dr. Grosenbach also commented upon Plaintiff's mental functional capacity. He opined that Plaintiff had extreme limitations in her ability to: (1) understand, remember, and carry out complex job instructions; (2) interact appropriately with supervisors and co-workers and to carry out supervisory commands; (3) maintain sustained concentration and attention; (4) respond appropriately to customary work pressures; and (5) travel unaccompanied outside one's immediate living environment. (Tr. 411-12). He noted that Plaintiff also had marked limitations in her ability to understand, carry out, and remember detailed job instructions and to deal appropriately with the public and that Plaintiff had a marked to extreme inability to initiate and participate in activities required for daily living.[5] *Id.*

---

[5]     The records also show that in 1996, Dr. Dittrich prescribed Xanax for Plaintiff to treat her anxiety. (Tr. 231-240). The records further indicate that Dr. Dittrich prescribed

IV.   **HEARING TESTIMONY**

A.   **Plaintiff's Testimony**

Plaintiff was 45 years old when she testified before ALJ Musseman.  She had a high school education and had completed 9 months of business school which resulted in a certification in medical billing.  (Tr. 609).  Plaintiff testified that she stopped working in 1997 due to her mastocytosis and its related symptoms and her anxiety.  (Tr. 611-14).  Her mastocytosis had caused tumors to grow.  Doctors had removed some tumors but they could not remove the tumors that were in her muscles.  Plaintiff told the ALJ that mastocytosis is rare and therefore her doctors did not know too much about it.  She also stated that there were no specialists in mastocytosis.  Plaintiff took medication to block the histamine levels and various medications to treat the specific symptoms caused by the mastocytosis.  (Tr. 626-627).

Due to back pain and fatigue, Plaintiff would sit in a recliner at home for about 4 hours in the morning and in between trips to the bathroom.  She also napped during the day for at least 1 to 2 hours every day.  (Tr. 614-15).  Plaintiff also testified that she had been diagnosed with an anxiety disorder for which she took Xanax for the past 12 years.  (Tr. 616).  The Xanax caused drowsiness.  *Id.*  Plaintiff also told that ALJ that she had a hard time with many tasks, most of which could cause an anxiety attack.  (Tr. 617).  During an anxiety

_____

0.5 mg of Xanax through December 1998.  Thereafter, Dr. Dittrich prescribed Stelazine.  (Tr. 231-40, 251-54, 269).  Dr. Franckowiak prescribed .05 mg of Xanax for Plaintiff in 2001-2002 to treat her anxiety.  (Tr. 455-67).

attack, Plaintiff would go to her bedroom and close the door. She indicated that she would

isolate herself on a daily basis. *Id.* Plaintiff also stated that she had problems with her knees,

for which she had prior surgeries. (Tr. 618). She experienced pain in her joints and soft

tissue and could not kneel, sit for long periods of time with her knees bent, or squat. (Tr.

619). Plaintiff also had surgery on her left shoulder. *Id.* She testified that she could not do

any type of repetitive rotation of her left shoulder. (Tr. 620). Plaintiff also told the ALJ that

she had a loss of fine motor control in her right hand. As a result, she could not cook

anymore. Plaintiff stated that she could write with her right, dominant hand for about 10 to

15 minutes but it was painful. *Id.* Plaintiff also had migraines once or twice a week, which

caused vomiting. The migraines would last 1 to 3 days. (Tr. 621). At night, Plaintiff stated

that she would sleep for 1 hour or 2 before needing to go to the bathroom. (Tr. 622). She

had diarrhea every morning for 4 hours and she had urinary incontinence with associated

urgency. *Id.*

When asked about her daily activities, Plaintiff testified that she no longer socialized

much with friends because she would end up arguing with them. (Tr. 623). She engaged in

no outside activities and only left the house for doctor visits, to which she would drive. *Id.*

Plaintiff stated that she only drove to the store if forced to do so. *Id.* Her relationship with

her family had also changed. Her husband took over a lot of responsibilities such as

shopping, cooking, handling the finances, and cleaning. (Tr. 624-25). Her husband and

daughter did the laundry. *Id.* Plaintiff watched television during the day but could not

really concentrate on it.  (Tr. 625).  She could not lift or bend due to pain.  (Tr. 628). She took pain medication but she needed 2 or 3 doses of the medicine before she got relief.  (Tr. 628-29).  The medicine caused drowsiness, concentration difficulties, and sometimes nausea. (Tr. 629).  Any increase in her activities could aggravate the symptoms of her mastocytosis. (Tr. 629-30).

> B.   <u>Vocational Expert's Testimony</u>

Melody Henry, a rehabilitation counselor, testified as a vocational expert ("VE") at the hearing.  (Tr. 630-35).  The ALJ asked Ms. Henry what jobs would be available in the lower peninsula of Michigan for an individual of Plaintiff's age, education, and work history who was limited to: (1) the full range of sedentary work with an option to sit/stand at-will; (2) one and two step tasks only; (3) no repetitive assembly-line-type use of the upper extremities; (4) no prolonged standing or walking, meaning a maximum of 10 minutes an hour; (5) no repetitive bending, squatting, kneeling, crawling, or climbing; (6) no over the chest level work; (7) no temperature extremes; (8) low stress jobs; and (9) no dealing with the general public.  (Tr. 631-32).  Ms. Henry testified that such an individual could perform 1,250 visual surveillance monitor positions, 1,035 metrics clerk positions, 5,470 general office clerk positions.  (Tr. 632).

## V.   LAW AND ANALYSIS

### A.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's

decisions. Judicial review of those decisions is limited to determining whether her findings are

supported by substantial evidence and whether she employed the proper legal standards.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir.

1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).

It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or

decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679,

681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the

Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human

Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the

Commissioner's decision is supported by substantial evidence, it must be affirmed, even where

substantial evidence also supports the opposite conclusion and the reviewing court would decide

the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

B.    FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.

C.    ARGUMENTS

1.    The ALJ's Assessment of Plaintiff's Mental Impairments

At step three, the ALJ determined that the "claimant's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, of Regulation No. 4." (Tr. 35)  Plaintiff contends that the ALJ's step-three determination is not supported by substantial evidence and that the record conclusively

-14-

establishes that her affective disorder meets the requirements of § 12.06 of the Listings.

In order to establish disability under the Listings, each requirement of the applicable Listing must be met.  See 20 C.F.R. § 404.1525(d)("We will not consider you impairment to be one listed in appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment"); *see also Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885 (1990)("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria").  If any one requirement is not satisfied, the ALJ must move beyond the Listings and determine whether the claimant can perform either his past work or other work that exists in significant numbers in the national economy. See 20 C.F.R. § 404.1520(a)(4)(iv), (v); *see also Foster, supra*, 279 F.3d at 354. The claimant bears the burden of demonstrating that her impairment meets or equals a listed impairment. *Id.*

Plaintiff asserts that her mental condition meets the requirements of § 12.06 of the Listings.  This listing consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12 .00(A).  The required level of severity for 12.06 anxiety-related disorders is met when "the requirements in both A and B are satisfied, or when the requirements in A and C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

The paragraph A criteria need not be discussed herein because the ALJ determined that Plaintiff suffered from severe anxiety under the regulations. (Tr. 35). The paragraph B requirements of listing 12.06 requires at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B). Paragraph C of the 12.06 listing requires that the disorder result in "complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C).

The ALJ did not undertake any analysis of whether Plaintiff's anxiety met the remaining criteria set forth in paragraphs B or C of Listing 12.06. An ALJ's failure to articulate the reasons for his or her findings precludes meaningful judicial review. *See Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)(articulation of reasons for disability decision essential to meaningful appellate review); *see also Bailey v. Comm'r of Soc. Sec.*, 1999 WL 96920 at **4 (6th Cir.)("Thus, an ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes."); Social Security Ruling ("SSR") 82-62 at *4 (The"rationale for a disability decision must be written so that a clear picture of the case can be obtained."). As the Third Circuit noted in *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981),

There are cogent reasons why an administrative decision

should be accompanied by a clear and satisfactory explication
of the basis on which it rests. Chief among them is the need for
the appellate court to perform its statutory function of judicial
review.  A statement of reasons or findings also helps to avoid
judicial usurpation of administrative functions, assures more careful
administrative consideration, and helps the parties plan their cases for
judicial review.

The ALJ offered nothing more that a conclusory statement that Plaintiff's impairments did

not meet or equal a listed impairment.  (Tr. 35).  The ALJ did not identify the applicable

listing and provided no explanation whatsoever of the evidentiary basis for the conclusion he

reached.  Indeed, the ALJ provided no indication as to the severity of Plaintiff's mental

limitations which was proven by the evidence.

The critical question is whether the ALJ's error necessitates a remand.  Plaintiff

asserts that a remand is required based upon Dr. Grosenbach's opinion that Plaintiff had

marked difficulties in maintaining social functioning and in maintaining concentration,

persistence, or pace.  Plaintiff further asserts that the ALJ's rejection of Dr. Grosenbach's

opinion is not supported by substantial evidence.

As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th

Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than

those of physicians who examine claimant's only once."  Indeed, 20 C.F.R.

§ 404.1527(d)(2) provides that a treating source's opinion regarding the nature and severity

of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

-17-

with the other substantial evidence" in the record. *See also Walters*, 127 F.3d at 530.  But, if

an ALJ rejects a treating physician's opinion on the issues of the nature and severity of a

claimant's impairments, he must "give good reasons" for doing so in his written opinion." 20

C.F.R. § 404.1527(d)(2); see also SSR 96- 5p.

The ALJ discussed Dr. Grosenbach's opinions and decided to afford them little

weight.  In making this decision, the ALJ articulated two reasons: (1) Dr. Grosenbach's

opinions were inconsistent with Plaintiff's testimony; and (2) Dr. Grosenbach's opinions

were inconsistent with the intake assessment completed by the therapist at the Lapeer

County Community Mental Health Center in 1999, which indicated only occasional fear,

anxiety, apprehension, depression, and sadness.  (Tr. 36).

As to the first reason, the ALJ made no mention as to which portion of Plaintiff's

testimony he believed was inconsistent with Dr. Grosenbach's opinions.  Furthermore,

Defendant does not point to, and the Court cannot see, any blatant contradictions between

Plaintiff's testimony as recited by the ALJ and Dr. Grosenbach's opinions.  Without a more

detailed explanation of any alleged inconsistencies, the Court cannot adequately trace the

logic of the ALJ's decision-making and therefore cannot determine whether the ALJ's

rejection of Dr. Grosenbach's opinions on this basis was proper.

The ALJ's rejection of Dr. Grosenbach's opinions based upon the 1999 intake

assessment is likewise unavailing.  The intake assessment, as the name implies, was generated

from a one-time interview with Plaintiff.  Moreover, it was completed by a social worker

who, unlike Dr. Grosenbach, is not an "acceptable medical source" as defined by the

regulations.  20 C.F.R. § 404.1513(a).  Furthermore, as noted by Plaintiff, the observations

made at the 1999 intake assessment are not necessarily inconsistent with Dr. Grosenbach's

2002 findings as they can equally portray Plaintiff's mental condition as they existed at the

time.[6]

Defendant points to other rationale that the ALJ could have relied upon to support his

decision to afford little weight to Dr. Grosenbach's opinions.  However, it is the duty of the

ALJ in the first instance to examine such facts, to apply them to the appropriate rules and

regulations, and to draw any reasonable conclusions from them to support his or her stated

findings so that this Court may conduct a meaningful review.  *See Ivy v. Sec'y of Health &*

*Human Servs.*, 976 F.2d 288, 289 (6th Cir.1992) (a reviewing court "should not be left to

guess as to the . . . reasons for granting or denying relief.").  Consequently, the ALJ's step 3

findings are not supported by substantial evidence.

Even assuming that the ALJ properly rejected Dr. Grosenbach's opinions, the ALJ's

failure to adequately address the severity of Plaintiff's mental limitations also leaves this

Court unable to determine whether the ALJ's RFC finding as to Plaintiff's mental

impairments is supported by substantial evidence.

---

[6]     Dr. Grosenbach also opined that Plaintiff's symptoms met the Listing of 12.04
for an adjustment disorder although he never diagnosed Plaintiff with such a condition.  The
ALJ did not discuss this evidence in his written opinion.  Upon remand, the Commissioner
should addressed this issue.

After determining that Plaintiff's anxiety did not meet or equal a listed impairment, the ALJ determined Plaintiff's mental RFC in accordance with 20 C.F.R.1520a(d)(3).  In assessing a claimant's mental RFC, the Court must develop a complete and accurate assessment of the claimant's mental impairment.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ accounted for Plaintiff's mental limitations by confining her to work involving no complex tasks, simple one or two step instructions, low stress, and no dealing with the general public.  (Tr. 37). Such an RFC finding may, or may not, reflect an accurate assessment of Plaintiff's limitations.  For example, if the ALJ determined that Plaintiff had moderate difficulties in maintaining social functioning because Plaintiff's anxiety made her respond inappropriately to supervisors, then the above-mentioned RFC finding would not be adequate.  Similarly, if the ALJ found that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace because Plaintiff would have a panic attack if she did not meet a quota, then the RFC finding would be insufficient because there is no timeliness related restriction contained within it.  Based upon the foregoing, the Court concludes that substantial evidence does not support the ALJ's assessment of Plaintiff's mental impairments.

### 2.    The ALJ's Assessment of Plaintiff's Physical Impairments

Plaintiff also asserts that the ALJ's RFC assessment of her physical impairments is not supported by substantial evidence.  Specifically, Plaintiff contends that the ALJ erred in rejecting the opinion of her treating physician, Dr. Dittrich.

-20-

Dr. Dittrich opined that due to her impairments, Plaintiff: (1) could not stand for more than 30-40 minutes at a time; (2) could not sit for more than 30-45 minutes at a time; (3) could not walk for more than one to two blocks without stopping; (4) could lift and carry less than 5 pounds; and (5) could not pull, push, squat, kneel, reach, twist, turn, or grasp.  He also opined that Plaintiff was required to lie down for one hour per day in the afternoon and to avoid extremes in temperature.  The ALJ discussed this opinion in his written decision. (Tr. 33).  However, the ALJ subsequently noted that he gave Dr. Dittrich's opinion no weight for three reasons: (1) Dr. Dittrich was not a specialist and Plaintiff had not been referred to a specialist; (2) Dr. Dittrich had not prescribed physical therapy, a TENS unit, or a pain clinic; and (3) Dr. Dittrich's opinion was not consistent with the objective, medical evidence. (Tr. 35).

Although the ALJ ultimately rejected Dr. Dittrich's opinions, the Court notes that some of Dr. Dittrich's restrictions were nevertheless incorporated into the ALJ's RFC finding.  For example, the ALJ limited Plaintiff to work that would accommodate her need to sit/stand at will and which involved no prolonged standing or walking.  Therefore, Plaintiff would not be required to sit or stand continuously for more than 30 to 40 minutes at a time or engage in a significant amount of walking.  The ALJ also limited Plaintiff to no repetitive assembly-line-type use of the upper extremities, no temperature extremes, and no repetitive bending or kneeling.

To the extent that the ALJ actually rejected Dr. Dittrich's opinions, substantial evidence supports the ALJ's decision. Plaintiff points to no objective, clinical findings that would support the restrictions imposed by Dr. Dittrich and none appear in the record. Furthermore, Dr. Dittrich's treatment of Plaintiff was fairly conservative, consisting primarily of medications. More aggressive treatments were not pursued, Plaintiff was not hospitalized for an extensive period of time, and no specialist was called in to assess and treat Plaintiff's mastocytosis. There is also no indication in Dr. Dittrich's treatment notes that he recommended Plaintiff abide by the restrictions at issue. Consequently, the Court finds that substantial evidence supports the ALJ's rejection of Dr. Dittrich's opinion.

### 3.    The ALJ's Credibility Assessment

The ALJ discussed Plaintiff's testimony and then stated that "[i]n view of the objective medical evidence, the undersigned finds that the claimant's testimony is exaggerated, and is therefore, not credible." (Tr. 37). Plaintiff claims that the ALJ erred in reaching this conclusion.

In dismissing Plaintiff's allegations as non-credible, the ALJ noted that objective, medical evidence did not support Plaintiff's claims. However, an ALJ cannot rely solely on the lack of objective medical evidence because the regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R.

§ 404.1529(c)(2).  In addition to the available objective medical evidence, the ALJ must

consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and

intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage,

effectiveness, and side effects of any medication taken to alleviate pain or other symptoms,

(5) treatment, other than medication, for pain relief, (6) any measures used to relieve the

pain, and (7) functional limitations and restrictions due to the pain.  See 20 C.F.R. §

404.1529(c)(3); see also *Felisky v. Bowen*, 35 F .3d 1027, 1039-40 (6th Cir. 1994) (applying

these factors).

Given the ALJ's comment that he was dismissing all of Plaintiff's subjective

complaints solely due to the lack of objective, medical evidence, the lack of a clear indication

that the ALJ considered the factors set forth in 20 C.F.R. § 404.1529, and the need for a

remand to reassess Dr. Grosenbach's opinions, which may offer support for some of

Plaintiff's claims, the Court finds that the ALJ's credibility statement is not supported by

substantial evidence.

### 4.    Consideration of New Evidence

Plaintiff also argues that this case should be remanded for consideration of new and

material evidence.  Specifically, Plaintiff points to the following evidence: (1) medical

records from Dr. Franckowiak dated January 2002 to April 2003; (2) medical records from

Plaintiff's new treating physician, Dr. Joseph Burtch, dated May 2004 to December 2004; and

(3) a medical record from the University of Michigan's Department of Internal Medicine

-23-

dated August 2004.  (Tr. 536-51; Pl.'s Mot. for Summ.J., Att. Ex. B; Docket ## 15-1, 15-2).

These documents were not before the ALJ when he rendered his written opinion.

Consequently, the Court cannot consider these documents in determining whether

substantial evidence supports the ALJ's non-disability determination.  *Cotten v. Sullivan*, 2

F.3d 692, 695-96 (6th Cir. 1993).

        The court may still remand the case to the ALJ to consider this additional evidence

but only upon a showing that the evidence is new and material and that there is good cause

for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C.

§ 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  This is referred to as a "sentence

six remand" under 42 U.S.C. § 405(g).  *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542,

549 (6th Cir. 2002).

        The party seeking remand has the burden of showing that it is warranted.  *Sizemore*

*v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).  "A claimant shows

'good cause' by demonstrating a reasonable justification for the failure to acquire and present

the evidence for inclusion in the hearing before the ALJ."  *Foster*, 279 F.3d at 357 (citing

*Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam).  "In order

for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that

there was a reasonable probability that the Secretary would have reached a different

disposition of the disability claim if presented with the new evidence."  *Sizemore*, 865 F.2d

709, 711 (6th Cir. 1988) (citing *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)).

Based upon the information before the Court, a remand for consideration of the evidence presented by Plaintiff would not be warranted.  The medical records dated January 2002 through March 12, 2003 from Dr. Franckowiak were created prior to the ALJ's decision.  The evidence was therefore not new and Plaintiff has not shown "good cause" for failing to provide these documents earlier.  *See Oliver v. Sec'y of Health & Human Srvs.*, 804 F.2d 964, 966 (6th Cir. 1986).  More importantly, none of Dr. Franckowiak's records are "material" in that they do not discuss symptomology, clinical findings, or limitations greater than those imposed by the ALJ.

Dr. Burtch's medical records and the record from the University of Michigan were created after the ALJ rendered his decision and are therefore "new".  Even assuming that Plaintiff has therefore simultaneously demonstrated "good cause" for failing to present these documents earlier, the records are not material.  These records simply describe Plaintiff's condition as it was reported in 2004.  This bears no relevance to the time period at issue before the ALJ.  Moreover, similar to the records of Dr. Franckowiak, these records do not demonstrate materially different symptomology, clinical findings, or limitations.  Although the records indicate that Plaintiff had a CT scan that showed degenerative disc disease of an unknown severity at L5-S1 of her lumbar spine, some of Dr. Burtch's records note that Plaintiff's examination findings were unremarkable.  Furthermore, Dr. Burtch recorded that Plaintiff was doing well overall, that Plaintiff's antihistamines were controlling her symptoms of mastocytosis, and that it was recommended that Plaintiff cut back on her pain

medication. (Docket # 15-1, pp. 1, 4, 8). There is also a notation that Plaintiff had a CT scan, which showed an adrenal mass. However, there are no recorded findings that this symptom resulted in restrictions greater than those imposed by the ALJ. Based upon the foregoing, the Court concludes that a remand for consideration of these materials is not warranted.

## VI.   <u>RECOMMENDATION</u>

The Commissioner's decision is supported by not substantial evidence. Defendant's Motion for Summary Judgment (Docket # 13) should be **DENIED**. Plaintiff's Motion for Summary Judgment (Docket # 12) should be **DENIED**. The case should be **REMANDED** to the Commissioner for further proceedings consistent with this Report.

Specifically, the case must be remanded back to the Commissioner so that she may: (1) conduct a new step 3 analysis identifying the applicable listing(s), evaluating the evidence under the listing(s) criteria, and specifically stating what level of severity the evidence supports; (2) re-assess Dr. Grosenbach's opinions in light of the findings made herein; (3) re-assess Plaintiff's credibility by addressing the factors set forth in 20 C.F.R. § 404.1529(c)(2) and specifically stating how the evidence when applied to these factors supports or undermines Plaintiff's credibility; (4) re-evaluate, if necessary, Plaintiff's mental and physical RFC; and (5) if warranted, conduct a new step-five analysis.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided

for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections

which raise some issues but fail to raise others with specificity will not preserve all

objections that party might have to this Report and Recommendation.  *Willis v. Secretary*,

931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the*

*United States District Court for the Eastern District of Michigan*, a copy of any objection

must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in

length unless by motion and order such page limit is extended by the Court.  The response

shall address specifically, and in the same order raised, each issue contained within the

objections.

Dated: February 15, 2007                    s/ Mona K. Majzoub                        
                                            MONA K. MAJZOUB
                                            UNITED STATES MAGISTRATE JUDGE


<u>PROOF OF SERVICE</u>

I hereby certify that a copy of this Report and Recommendation was served upon
Counsel of Record on this date.

Dated: February 15, 2007                    s/ Lisa C. Bartlett                       
                                            Courtroom Deputy